UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

N.M, through her Guardians and Grandparents, SALEEM M. and SHAHIDA M., and SALEEM M. and SHAHIDA M. in their own right,
    Plaintiffs

v.

CENTRAL YORK SCHOOL DISTRICT,
    Defendant

NO.: 1:09-CV-00969

(JUDGE CONNER)
(MAGISTRATE JUDGE PRINCE)

## **REPORT AND RECOMMENDATION**

Pursuant to an Order entered on August 4, 2010 (Doc. 46), Honorable Christopher Conner referred defendant's pending motion for summary judgment and disposition on the administrative record (Doc. 32) and plaintiff's pending motion for judgment on the supplemented administrative record (Doc. 37) to the undersigned Magistrate Judge.

**I. Background**

*(A) Facts of the case*

After a thorough review of the administrative record, the Court sees no need to disturb the ALJ's findings of fact. The facts as stated are drawn from the facts as found by the Administrative Law Judge (ALJ) following the hearing below and are largely a restatement of the ALJ's findings, with occasional matters from the record being noted here despite going unmentioned in the ALJ's opinion.

Plaintiff N.M., a minor, is a student enrolled in a school within defendant Central York School District. (Doc. 34-6, at 3 ¶ 1.) She has been diagnosed with cerebral palsy,

and makes regular use of a wheelchair and needs an aide for personal care. (*Id.* ¶ 3.) She is eligible under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§ 1400–82 (West 2010), for special-education services by reason of an Other Health Impairment (OHI). (Doc. 34-6, at 3 ¶¶ 1–2.)

N.M. began attending schools within the District as a second-grade student. (*Id.* ¶ 4.) From then through her fourth-grade year, she received all of her education in a regular classroom, supplemented by one and one-half hours of individual tutoring in math from an instructional-support teacher during each six-day academic cycle. (*Id.*) She successfully passed from grade to grade, and by the end of her fourth-grade year, was meeting or working toward meeting the District's competency standards in all academic areas. (*Id.*)

At the end of the 2006–2007 academic year, at which point N.M. had just completed fourth grade, her aunt and grandparents expressed concern that she was not doing as well as she could in her academic classes. (*Id.* ¶ 5.) Her teachers noted that she struggled with learning and retaining concepts in all subject areas, that she was below average in reading, writing, and math skills, and that she required significant assistance to accomplish academic tasks well. (*Id.*) At this time, N.M. was receiving occupational therapy, physical therapy, and speech and language therapy within the school setting. (Doc. 14-10, at 3.) In a written survey and in Individualized Education Program (IEP) meetings, N.M.'s aunt and grandparents requested learning-support services for her, believing that she would make better progress with additional time and support for tests and completing assignments. (Doc. 34-6, at 5 ¶ 8.)

In August 2007, the District's school psychologist reevaluated N.M. (*Id.* ¶ 6.) Intelligence assessments placed her overall in the below-average range for verbal and nonverbal intelligence. (*Id.*) She tested at the average level for her ability to encode, store, and recall verbal and pictorial information. (*Id.*) Her reading and nonword reading skills were low-average to average; her comprehension skills where high average. (*Id.*) Her

computational math skills were in the high-average range, and her math-reasoning skills were borderline. (*Id.*) She tested in the low-average range in writing. (*Id.*) The school psychologist noted that N.M. was motivated to do well, demonstrated progress with one-to-one assistance, had strong social-interaction skills with both peers and adults, and enjoyed a good relationship with her peers, who were helpful and kind to her. (*Id.* at 5 ¶ 7.) Recommendations in the reevaluation report included more intensive small-group or one-to-one instruction to address focus, concentration, and inconsistent academic performance, along with continued monitoring by regular and special-education teachers. (*Id.*) The school psychologist concluded that learning support was the best setting for providing N.M. with such additional services. (*Id.*)

The Notice of Recommended Educational Placement (NOREP) that N.M.'s grandparents approved for the 2007–2008 academic year specified that N.M. needed learning-support services for academic subjects because she was not making sufficient progress in the general-education classroom. (*Id.* ¶ 10.) According to the NOREP, N.M. would be receiving "resource level support services."[1] (*Id.*) The final 2007–2008 IEP provided that N.M. would receive all academic instruction in the special-education classroom, which together accounted for twenty-two hours, or 68% of her week; the remaining 32%, or 10.5 hours, she would be in a regular classroom with the rest of her peers for homeroom, lunch, and specials. (*Id.* ¶ 11.)

N.M. had surgery during the summer of 2007, and she spent much of the first quarter of the 2007–2008 academic year recovering. (*Id.* ¶ 9.) She did not return to school for fifth grade until October 22, 2007. (*Id.*) Her 2007–2008 IEP called for consultative

---

[1] Under then-current regulations, the Pennsylvania Code defined "resource" as "[r]egular classroom instruction for most of the day, with special education services and programs provided by special education personnel in a resource room for part of the school day." (Doc. 14-10, at 39–40.)

3

physical-therapy services, but when a new physical therapist took over her case in December 2007 and learned that she had regressed in her physical skills since her surgery, she began receiving direct physical-therapy services as well. (*Id.* at 6 ¶ 13.) She increased the time that she was able to stand and decreased the level of assistance she needed, making progress that her grandparents appreciated. (*Id.*) The District reported that she made good academic progress through her fifth-grade year. (*Id.* ¶ 15.)

For the 2008–2009 academic year, when N.M. entered sixth grade, she returned to the regular-education classroom, where she had the benefit of a personal assistant and a variety of other accommodations. (*Id.* ¶ 17.) Although she still was not reading at grade level, she continued to make good academic progress. (*Id.*)

## (B) Procedural history

This case began as a due-process challenge to N.M.'s 2007–2008 IEP, in which N.M.'s grandparents claimed that she was denied a free appropriate public education (FAPE) under IDEA because her placement in a learning-support classroom for all academic subjects was a violation of her right to education in the least restrictive environment (LRE). The hearing took place over four sessions between September 30, 2008 and January 8, 2009. The ALJ determined that there were four issues in the case: (1) whether the District provided N.M. with a FAPE; (2) whether the District ensured that N.M. was placed in the LRE during the 2007–2008 school year; (3) whether N.M. made meaningful education progress during the year; and (4) whether the District provided N.M. with appropriate related services for the year.

After the hearing, the ALJ issued a decision on February 24, 2009, holding that the District had failed to provide N.M. with a FAPE in the LRE, but held that N.M. had made meaningful educational progress and that the District had provided appropriate related services. (Doc. 34-6, at 12–13.) The ALJ granted an award of a compensatory-education

4

fund to N.M. for the LRE violation, ordering compensation of two hours per school day that N.M. attended during 2008–2009, and stated:

> The monetary value of the compensatory-education award will be measured by the average and proportional hourly cost of a fifth-grade regular-education teacher in the District during the 2007–2008 school year, including salary and fringe benefits. ([This value can be calculated thus:]) Average hourly compensation of a regular-education fifth-grade teacher during the 2007–2008 school year ÷ average number of students in fifth-grade classes in [the] 2007–2008 school year × [the] number of compensatory-education hours[.])

(*Id.* at 20 ¶ 5.) Making the indicated calculation, the District arrived at a total of 238 hours valued at $2.29 per hour, for a total award of $545.02. (Doc. 23-3, ¶ 3.)

N.M. and her grandparents, not happy with the valuation method that the ALJ chose for the compensatory-education award, appealed that part of the decision by filing a complaint in district court on May 21, 2009 (Doc. 1), which, after changing attorneys, plaintiffs amended on March 23, 2010 (Doc. 25). They did not otherwise challenge the ALJ's decision. The District filed an answer on April 8 (Doc. 26), which included a counterclaim maintaining that the ALJ erred in awarding a compensatory-education fund at all. Plaintiffs answered on April 28. (Doc. 29.)

Over the following months, both parties submitted dispositive motions. Defendant filed a motion for summary judgment and disposition on the administrative record on May 27, 2010. (Doc. 32.) On June 1, plaintiffs filed a motion for judgment on the supplemented administrative record. (Doc. 37.) Both parties have submitted briefs in support of their respective motions (Docs. 33, 38), in opposition to each other's motions, (Docs. 41, 42), and in reply to the opposing briefs (Docs. 41, 45). Meanwhile, plaintiffs had moved for the introduction into evidence of an expert report (Doc. 35), which was fully briefed by the parties (Docs. 36, 42, 44); the motion was ultimately granted by the Court on September 2, 2010 (Doc. 47). The parties' dispositive motions are now ripe for adjudication.

**II. Standard of Review**

*(A) Summary judgment*

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories,

or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

*(B) Judgment on the administrative record*

A court's review of an administrative law judge's decision in an IDEA case is subject to a unique standard of review. IDEA itself states that the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C.A. § 1415(i)(2)(C) (West 2010).

The United States Supreme Court has interpreted this language to require a district court to accord "due weight" to the administrative proceedings, being careful to avoid substituting its "own notions of sound educational policy for those of the school authorities [that] they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). To give "due weight" means to conduct a "modified *de novo* review," under which factual findings from the administrative proceedings "are to be considered prima facie correct." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003) (quoting *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995); *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530–31 (4th Cir. 2002);

7

citing *Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 927 (10th Cir. 1995)). *Accord Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001).

A court may diverge from the facts found below, but must explain any divergence. *Id.* (quoting *MM*, 303 F.3d at 531.) Any findings below based on credibility judgments require deference from the court "unless the nontestimonial, extrinsic evidence in the record" or "the record read in its entirety" would "compel" a contrary conclusion. *Id.* (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 527 (3d Cir. 1995)). But when a district court hears additional evidence under § 1415(i)(2)(C)(ii), the court is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act." *Id.* (quoting *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1220 (3d Cir. 1993)).

The court's review of conclusions of law is plenary, requiring no deference to the administrative law judge's legal holdings. *Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 83 (3d Cir. 1999) (citing *Scott P.*, 62 F.3d at 526).

**III. Discussion**

*(A) Burden of proof*

Courts have long recognized an "apparent tension" within IDEA "between the strong preference for mainstreaming" disabled children, expressed in 20 U.S.C.A. § 1412(a)(5)(A) (West 2010), and the "requirement that schools provide individualized programs tailored to the specific needs of each disabled child," *id.* §§ 1412(a)(4), 1436(d), 1414(d). *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1214 (3d Cir. 1993). When, in *Oberti*, the Third Circuit first addressed the allocation of the burden of proof in LRE cases, the court held it "appropriate to place the burden of proving compliance with IDEA on the school." *Id.* at 1219. Based on the notion that requiring parents "to prove that their child was worthy of being included" in the regular classroom was anathema to IDEA's

presumption favoring mainstreaming, *Oberti* required the school "to justify a decision to exclude the child from the regular classroom." *Id.* at 1219–20. Under *Oberti*, placement in a regular classroom was required under IDEA unless a school district could "show by a preponderance of the evidence that [a] child cannot be educated satisfactorily in a regular class with supplementary aids and services." *Id.* at 1224.

The Third Circuit's analytical framework established in *Oberti* remained more or less unchanged for more than a decade, until the Supreme Court decided *Schaffer v. Weast*, 546 U.S. 49 (2005). *Schaffer* put the burden of persuasion in IEP cases "where it usually falls, upon the party seeking relief." *Id.* at 57–58. The Court noted that "IDEA relies heavily upon the expertise of school districts to meet its goals," and that the "stay-put provision" of IDEA required a child to "remain in his or her 'then-current educational placement' during the pendency of an IDEA hearing." *Id.* at 59 (quoting 20 U.S.C.A. § 1415(j)). Because Congress apparently presumed that "if the Act's procedural requirements are respected, parents will prevail when they have legitimate grievances," it would be inconsistent with IDEA "to assume that every IEP is invalid until the school district demonstrates that it is not." *Id.* at 59–60.

Any uncertainty about whether *Schaffer* applied just to the FAPE analysis or to all aspects of an IEP dissipated after the Third Circuit's decision in *L.E. v. Ramsey Board of Education*, 435 F.3d 384 (3d Cir. 2006). The plaintiffs in *L.E.* challenged an IEP in essentially the same way as plaintiffs make their challenge in the case at bar: they argued that their child was denied a free appropriate public education in the least restrictive environment. *Id.* at 392. The court explicitly applied *Schaffer* and placed the burden of persuasion on the appellant–parents, reasoning that nothing in *Schaffer* limited the holding to only the FAPE analysis. *Id.* at 391–92.

*(B) The ALJ's conclusion in the proceedings below*

Under the guidance of both *Schaffer* and *L.E.*, then, it is incumbent upon plaintiffs in this case to prove, by a preponderance of the evidence, that the IEP for N.M. did not place her in the least restrictive environment. However, in the administrative proceedings below, the ALJ incorrectly placed the burden of proof—of both production and persuasion[2]—upon defendant Central York School District. (Doc. 34-6, at 11 n.3.) The effects of this placement of the burden of proof can be seen in the ALJ's review of the evidence upon which she based her legal conclusion, as well as the conclusion itself:

> In the absence of any evidence that the District considered, much less applied[,] the *Oberti* factors[3] in determining that [N.M.] should be placed in a learning support setting for all academic instruction, and in light of the evidence that [N.M.] was successfully educated in a far less restrictive environment before the [2007–2008] school year, and that she has been successfully returned to primarily regular education classes for the current school year, I conclude that the District failed to provide [N.M.] with FAPE in the least restrictive environment . . . .

---

[2] The *Schaffer* Court noted that that "[t]he term 'burden of proof' is one of the 'slipperiest member[s] of the family of legal terms.'" *Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (quoting 2 John W. Strong et al., McCormick on Evidence § 342, at 433 (5th ed. 1999)). The term "burden of production" refers to "which party bears the obligation to come forward with the evidence at different points in the proceeding," whereas "burden of persuasion" refers to "which party loses if the evidence is closely balanced." *Id.* (citing *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 272 (1994)). Although *Schaffer* dealt exclusively with the burden of persuasion, there is nothing in the case law or IDEA that suggests that *Oberti* controls placement of the burden of production even as *Schaffer* and *L.E.* imply that the plaintiff should carry the initial burden of production as well. Requiring a school to satisfy the initial burden of production before a plaintiff challenging an IEP must produce any evidence would be too much akin to "assum[ing] that every IEP is invalid until the school district demonstrates that it is not," *id.* at 59, which the *Schaffer* court specifically proscribed.

[3] The *Oberti* factor are listed in a quotation from *L.E. v. Ramsey Board of Education* in Part III.C *infra*.

(Doc. 34-6, at 13.) None of these three points of evidence bear on plaintiffs' burden in this case. A *lack* of evidence of what the District *did* consider, as opposed to *affirmative* evidence of what the District *failed* to consider, does not tend to support plaintiffs' case. Plaintiffs cannot argue that defendant should have introduced evidence in lieu of actually introducing evidence themselves; an argument about what defendant did not do is not the same as plaintiffs meeting their burden of production or of persuasion. The evidence about N.M.'s education before or after the 2007–2008 school year has only scant circumstantial value in answering the question of whether N.M. was educated in the least restrictive environment during 2007–2008. N.M.'s needs during the 2007–2008 year may have been different from her needs in other years, particularly because of the surgery she underwent before school began in Fall 2007 as well as her following period of convalescence, which kept her from returning to school until October 22, 2007. In short, the evidence that the ALJ cited does not support the conclusion that she drew.

### (C) Whether N.M. received FAPE in the LRE

IDEA "require[s] that a disabled child be placed in the least restrictive environment . . . that will provide him with a meaningful educational benefit." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (quoting *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000)). This "mainstreaming component" of IDEA mandates that disabled children be educated along with children who are not disabled to the greatest extent possible. *Id.* (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995)). To determine whether this mandate has been satisfied, a court considers "(1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom." *Id.* (quoting *Kingwood Twp.*, 205 F.3d at 579). As summarized in the *L.E.* opinion:

> [A] court determines, through a comparison of educational opportunities supported by expert testimony, whether the child can be satisfactorily educated in a regular classroom with supplemental services. If it finds that the child cannot be satisfactorily educated in that manner, the court must consider whether the school attempted to mainstream the child to the maximum extent possible.

*Id.* at 391. Although the Third Circuit had "always placed the burden of demonstrating compliance with the IDEA on the school district," the Supreme Court's decision in *Schaffer* placed the burden "upon the party seeking relief"—here, N.M. and her grandparents. *Id.* (citing *Kingwood Twp.*, 205 F.3d at 579; *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1219 (3d Cir. 1993); quoting *Schaffer v. Weast*, 546 U.S. 49, 62 (2005)).

Little evidence of record bears on the question of whether N.M. received her fifth-grade education in the least restrictive environment. Many of the documents that plaintiffs submitted, and much of the testimony they elicited from witnesses at the hearing, addressed N.M.'s performance during sixth grade, in the academic year that followed the one in question. Other exhibits and testimony related to the previous year—N.M.'s fourth-grade year—or to the matter of whether N.M. made academic progress in fifth grade. Although *L.E.* requires expert testimony in an IEP challenge of this sort, plaintiffs introduced none.

The questions that plaintiffs would have needed to answer did not get answered. Plaintiffs did not introduce evidence that showed that the District knew or should have known that N.M. needed less time in the special-education classroom than her 2007–2008 IEP called for. There is nothing in the record to show that N.M. could have functioned as well or better in a regular classroom than she did in the special-education classroom. To the contrary, plaintiffs had noticed at the end of N.M.'s fourth-grade year that she was not performing as well as they had hoped, and so requested more learning support for her. Although plaintiffs argued at the administrative hearing that N.M. had experienced academic regression in fifth grade, the evidence failed to bear this out. And true as it is

that, as of the early part of her sixth-grade year, N.M. still struggled to perform at grade level in some areas, she made the honor roll for the first marking period—a feat that N.M. appears not to have accomplished previously, and a feat that is inconsistent with the notion that she regressed during fifth grade. Before N.M. entered fifth grade, all the relevant parties agreed that she needed more learning support than she had been getting, and plaintiffs have failed to produce a preponderance of persuasive evidence that the learning support she received in fifth grade left her with less time in the regular classroom than she should have had.

Although plaintiffs did establish that N.M. received almost all of her education in fourth and sixth grade in the regular classroom, they introduced no evidence establishing that N.M.'s needs and circumstances in fifth grade were the same as they were in the surrounding years. And to the extent that the record does contain evidence relevant to this point, it tends to show that N.M.'s needs were different. As noted above, N.M.'s grandparents had requested more learning support for N.M. after her fourth-grade year. Since they felt that she could have been doing much better with more learning support, the level of regular classtime that N.M. had in fourth grade is a poor indicator of what might have been appropriate in fifth grade. N.M. also had surgery in the summer following fourth grade, which kept her out of school and in a state of convalescence until late October, more than a month into the school year. N.M.'s grandparents and the District's evaluators noted that N.M. experienced physical regression as a result of the surgery. Thus, as of the time N.M. was able to return to school in late October, she was suffering from a double setback: first, her general difficulty in keeping up in the regular classroom, and second, the need to catch up after being left more than a month behind in the fifth-grade curriculum. The particularities of these circumstances were not present in either N.M's fourth- or sixth-grade years, making both of these years unsuitable as

reference points for determining LRE. Evidence about N.M.'s experience in fourth and sixth grades is unpersuasive as to what she may have needed in fifth grade.

The only evidence that tends directly to support plaintiff's case is parts of the Reevaluation Report conducted by the District on August 17, 2007. (Doc. 14-10, at 2–11.) The report noted that as of the end of her fourth-grade year, N.M. was meeting or near to meeting the District's standards in all academic years, while receiving most of her instruction with accommodations in a regular classroom. (*Id.* at 3; Doc. 34-6, at 4 ¶ 4.) But plaintiffs had nonetheless requested additional learning support, expressing their belief that N.M. could be doing better than she was. (Doc. 34-6, at 4 ¶ 5, 5 ¶ 8.) The same report also noted that N.M.'s fourth-grade teacher was concerned about N.M.'s ability to keep up in the classroom: she struggled to keep up in the regular-education classroom despite extensive accommodations, and "was still working toward district standards in most areas, while most of [N.M.'s] peers had met some or many of the standards at that point in the school year." (Doc. 14-10, at 4; Doc. 34-6, at 4 ¶ 5.) Further, the report indicated that additional data was needed and that further "tests and other evaluation materials" should be administered in light of N.M.'s "inconsistent progress in the regular education environment despite accommodations." (Doc. 14-10, at 5.) There is no evidence that the authors of the report were aware that N.M. had or was going to have surgery, or that she was going to be out of school until late October. Even if the report can be taken as evidence that N.M. was able to obtain an adequate education benefit from the regular classroom during fourth grade, the general concern from N.M.'s teachers, the indicated need for additional data, and the surgery that N.M. underwent between fourth and fifth grade show that the report cannot be taken as evidence of N.M.'s ability to succeed in a regular classroom during the 2007–2008 school year.

It is worth further emphasizing the significance of N.M.'s surgery on her ability to succeed in a regular-education environment. Before her surgery, in fourth grade, N.M.

14

was struggling to keep up even with extensive support services. She did not have a specific learning disability; rather, her struggles in school were the product of her cerebral palsy and the attendant physical disability. So when N.M. suffered regression in her physical skills as a result of her surgery, it could be expected that her school performance, which was borderline before, would have worsened without additional support. Even if N.M. had been able to "receive an educational benefit from regular education" during fourth grade, her circumstances in fourth and fifth grade were different. The evidence suggests that additional support was indeed necessary for N.M. during fifth grade, and plaintiffs did not introduce evidence sufficient to establish that it was not.

As a result, it is of no consequence that the District introduced no evidence on whether it considered the *Oberti* factors or on any other aspect of its decisional process. The burden of proof lay squarely upon plaintiffs, which is a burden they failed to carry, thereby relieving defendant of any evidentiary duty that it might otherwise have had.

## IV. Conclusion

Based on the foregoing discussion, it is recommended that plaintiff's motion for judgment on the supplemented administrative record be DENIED and defendant's motion for summary judgment be GRANTED. It is therefore recommended that the decision of the administrative law judge be REVERSED to the extent that it held that defendant failed to provide N.M. with a free appropriate public education in the least restrictive environment, and MODIFIED to vacate the compensatory-education award to plaintiffs.

s/ William T. Prince  
William T. Prince  
United States Magistrate Judge

September 10, 2010